ADA PEARL STONE AND CECIL GLYNN JERNIGAN, INDIVIDUALLY, AND AS SHAREHOLDERS OF CREEKSIDE ENTERPRISES, INC. v. R. L. MARTIN, JR. AND LARRY G. SANDERFORD AND CREEKSIDE ENTERPRISES, INC.

No. 8010SC1061

(Filed 6 April 1982)

1. **Constitutional Law § 74; Rules of Civil Procedure § 33— request for discovery—right against self-incrimination—question for court**

    Determination of whether the privilege against compulsory self-incrimination applies to requested discovery must be by the court, not by the individual claiming the privilege. G.S. 1A-1, Rule 26(b)(1).

2. **Constitutional Law § 74; Rules of Civil Procedure § 37— order compelling discovery—sanctions—punitive damages—right against self-incrimination**

    The trial court's order compelling defendant to respond to interrogatories and requests for admissions and imposing sanctions and default judgment for his failure to do so did not violate defendant's constitutional right against compulsory self-incrimination because plaintiffs sought punitive damages for fraud and body execution where (1) the requested discovery would not necessarily tend to subject defendant to a punitive damages award, and (2) the trial court's order simply granted through discovery procedure access to information in corporate records which defendants refused to permit plaintiffs to inspect and which plaintiffs as shareholders could obtain in any event by mandamus pursuant to G.S. 55-37 and G.S. 55-38. G.S. 1A-1, Rule 37.

APPEAL by defendant R. L. Martin, Jr., from *Preston* and *Lee, Judges.* Order filed 31 March 1980 by *Judge Preston* and order and judgment filed 12 September 1980 by *Judge Lee*, in Superior Court, WAKE County. Heard in the Court of Appeals 1 May 1981. Reheard 10 December 1981.

Defendant R. L. Martin, Jr. (hereafter defendant), appeals from Judge Preston's order compelling him to answer interrogatories and requests for admission,[1] and from Judge Lee's order imposing the sanctions of striking his answer, prohibiting him from opposing claims or allegations set out in the complaint, and rendering judgment by default against him.

We allowed defendant's petition to rehear our former decision in this case, reported in 53 N.C. App. 600, 281 S.E. 2d 402 (1981), for the purpose of reconsidering its holding and rationale.

1. See Appendix at end of opinion.

We conclude from careful reconsideration that the holding should stand, but the rationale should be re-stated as set forth herein.

*Brenton D. Adams and Woodall, McCormick & Felment, by Edward H. McCormick, for plaintiff appellees.*

*Hunter, Wharton and Howell, by John V. Hunter, III, for defendant R. L. Martin, Jr.*

WHICHARD, Judge.

Plaintiffs, shareholders in defendant corporation, filed a complaint against the corporation and the individual defendants, who were officers, directors, and shareholders thereof, alleging numerous improper and unlawful acts and omissions in the operation of the corporation. They sought compensatory damages, punitive damages, and, as to the individual defendants, arrest and bail and execution against the person.

Plaintiffs served on defendant fifty-eight interrogatories and fifteen requests for admission. Defendant claimed with respect to each that because the complaint sought punitive damages, which are in the nature of a penalty, to answer would violate his privilege against compulsory self-incrimination under United States Constitution amendments V and XIV and North Carolina Constitution article I, section 23. Plaintiffs moved under G.S. 1A-1, Rule 37(a), to compel defendant to comply with discovery. Judge Preston found that three of the interrogatories and three of the requests for admission called for potentially incriminatory answers and denied plaintiffs' motion with respect thereto. He ordered defendant to answer the remaining interrogatories and requests within thirty days.

Upon defendant's failure to comply, plaintiffs moved for imposition of Rule 37(b) sanctions. Judge Lee struck defendant's answer and ordered that he not oppose any claim or allegations set forth in plaintiffs' complaint. He further ordered judgment by default against defendant, the issue of damages being for jury determination.

Defendant contends the orders compelling him to respond, and imposing sanctions for his failure to do so, infringe upon his constitutional privilege against compulsory self-incrimination. He

does not contend that answering may subject him to criminal punishment; rather, he contends that because plaintiffs seek punitive damages and body execution, he cannot be compelled to submit to discovery. On this record we find no infringement of defendant's constitutional privilege.

G.S. 1A-1, Rule 37, provides, in part:

(a) *Motion for order compelling discovery.* — A party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling discovery as follows:

. . . .

(2) Motion. — If . . . a party fails to answer an interrogatory submitted under Rule 33 . . . the discovering party may move for an order compelling an answer . . . .

. . . .

(b) *Failure to comply with order.* —

. . . .

(2) Sanctions by Court in Which Action is Pending. — If a party . . . fails to obey an order to provide or permit discovery, including an order made under section (a) of this rule . . . , a judge of the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

. . . .

b. An order refusing to allow the disobedient party to support or oppose designated claims or defenses . . .;

. . . .

Thus, if the court acted properly in compelling defendant to answer, upon his failure to do so the court had authority to impose sanctions. The court properly ordered defendant to answer if the information sought was discoverable.

Under North Carolina discovery rules, subject only to limitation by court order, any party to a civil action is entitled to all information relevant to the subject matter of that action *unless such information is privileged.* G.S. 1A-1, Rule 26(b)(1). The right of discovery must yield, however, to the privilege against compulsory self-incrimination. *LaFontaine v. Southern Underwriters,* 83 N.C. 132, 138 (1880); *see also, e.g., Allred v. Graves,* 261 N.C. 31, 134 S.E. 2d 186 (1964). Thus, courts cannot compel disclosure of information which would tend to incriminate the person from whom it is sought and cannot impose sanctions on one who refuses to disclose privileged information.

In *Allred v. Graves,* our Supreme Court held that the North Carolina Constitution protects from compulsion, on discovery, to reveal matters which would necessarily tend to subject the disclosing party to verdicts or awards of punitive damages and executions against the person. 261 N.C. at 38, 134 S.E. 2d at 192. The rationale for extending the privilege from information which would subject to criminal punishment to information which, in civil cases, would necessarily tend to subject to punitive damages and body execution, was the penal nature of punitive damages and body execution under North Carolina law. With respect to the fifth amendment privilege against compulsory self-incrimination, the court adhered to principles espoused by the federal courts.

[1] In civil cases, as well as in matters which may subject to criminal punishment, "the privilege protects against real dangers, not remote and speculative possibilities." *Zicarelli v. New Jersey Investigation Commission,* 406 U.S. 472, 478, 32 L.Ed. 2d 234, 240, 92 S.Ct. 1670, 1675 (1972). "[I]t would be to convert a salutory protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice." *Mason v. United States,* 244 U.S. 362, 366, 61 L.Ed. 1198, 1200, 37 S.Ct. 621, 622 (1917). Determination of whether the privilege applies must be by the court, not the individual claiming the privilege. "The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified . . . ." *Hoffman v. United States,* 341 U.S. 479, 486, 95 L.Ed. 1118, 1124, 71 S.Ct. 814, 818 (1951).

[T]o vacate an order for examination, . . . it must be plainly apparent that the evidence sought must *necessarily* tend . . . to subject [the party to be examined] to a penalty or forfeiture. . . . [The] plaintiff should not be denied a plain statutory right to examine defendants . . . before trial solely because they claim that any answers they make may subject them to a penalty. This rests the matter upon the *ipse dixit* of each defendant and not upon the judgment of the court.

*Allred*, 261 N.C. at 39, 134 S.E. 2d at 192-193 (emphasis in original). Because, "if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee," the court must review the questions in the setting in which asked and require the witness to answer if "it clearly appears to the court that he is mistaken" in asserting the privilege. *Hoffman*, 341 U.S. at 486-487, 95 L.Ed. at 1124, 71 S.Ct. at 818. Further, the trial judge "is in [a] much better position to appreciate the essential facts than an appellate court . . . and he must be permitted to exercise some discretion, fructified by common sense, when dealing with this necessarily difficult subject." *Mason*, 244 U.S. at 366, 61 L.Ed. at 1200, 37 S.Ct. at 623 (1917).

[2]   That plaintiffs seek punitive damages does not, *ipso facto*, entitle defendant to refuse, with impunity, to submit to the requested discovery. When defendant refused to respond, asserting privilege, plaintiffs properly sought trial court determination as to the propriety of the assertion. Plaintiffs had prayed for punitive damages "as punishment for the fraudulent conduct of . . . [defendant] . . . ." To establish fraud plaintiffs must show: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E. 2d 674, 677 (1981); *Shreve v. Combs*, 54 N.C. App. 18, 21, 282 S.E. 2d 568, 571 (1981). None of the requested discovery to which the court ordered response would compel defendant to admit the calculation and intent requisite to establishment of fraudulent conduct. The responses, therefore, whether individually or collectively, would not necessarily tend to subject defendant to a punitive damages award. Review of the discovery requests in the setting in which

made thus discloses no impropriety in the order that defendant respond.

Further, the requested discovery related almost entirely to the operation of defendant corporation, of which plaintiffs had been shareholders for more than six months preceding filing of their complaint. Plaintiffs thus had a statutory right, enforceable by an action in the nature of mandamus, to inspect the records of the corporation. G.S. 55-38. They had the further right, similarly enforceable, to inspect the annual financial statement of the corporation and the record of shareholders. G.S. 55-37; *White v. Smith*, 256 N.C. 218, 123 S.E. 2d 628 (1962). Plaintiffs alleged that defendants had denied their oral and written demands for opportunity to inspect the corporate records. The requested discovery to which the court ordered response sought information which the corporate records should have contained and which plaintiffs thus would have received had defendants complied with the statutory requirements for maintenance of corporate records and observed plaintiffs' right to inspect. "[T]he privilege against self-incrimination is a purely personal one," and "the official records and documents of [a corporation] that are held by [an individual] in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though production of the papers might tend to incriminate [the individual] personally." *United States v. White*, 322 U.S. 694, 699, 88 L.Ed. 1542, 1546, 64 S.Ct. 1248, 1251 (1944). It is thus evident that Judge Preston's order simply granted through discovery procedure access to information which plaintiffs could obtain in any event by mandamus.

It should be evident that tensions adhere within the law applicable to the area in which the problem presented falls, and that the standards prescribed for resolving those tensions are not necessarily easily applied in individual cases. We remain persuaded, however, from a careful examination of the standards and of the record in this case, that the standards were properly applied here.

For the foregoing reasons we affirm the order requiring defendant to comply with discovery. Because defendant failed to comply with that order, we find no abuse of discretion in the order imposing sanctions and judgment by default. *See Laing v.*

*Loan Co.*, 46 N.C. App. 67, 264 S.E. 2d 381, *disc. rev. denied,* 300 N.C. 557, 270 S.E. 2d 109 (1980); *Silverthorne v. Land Co.*, 42 N.C. App. 134, 256 S.E. 2d 397, *disc. rev. denied,* 298 N.C. 300, 259 S.E. 2d 302 (1979); *Plumbing Co. v. Associates*, 37 N.C. App. 149, 245 S.E. 2d 555, *disc. rev. denied,* 295 N.C. 648, 248 S.E. 2d 250 (1978); W. Shuford, *North Carolina Civil Practice and Procedure* § 37-3 (2d ed. 1981).

Our opinion reported in 53 N.C. App. 600, 281 S.E. 2d 402 (1981) is withdrawn and is superseded by the opinion herein.

Affirmed.

Judges MARTIN (Robert M.) and BECTON concur.

APPENDIX

The interrogatories to which defendant was ordered to respond were as follows:

1. List the name, telephone number and current address of each and every person who has any books or records relating to or involving Creekside Enterprises, Inc.

2. List the name, current address and telephone number of each and every person who has been employed by Creekside Enterprises, Inc.

3. List the complete assets of Creekside Enterprises, Inc. for each year of its existence including the present list of assets.

4. List the name, current address and telephone number of the purchaser of the business known as "Players" from Creekside Enterprises, Inc.

5. Set out in detail the terms of the sale of the business known as "Players" by Creekside Enterprises, Inc. (a copy of all contracts with the purchaser will be sufficient to answer this interrogatory).

6. List the total amount of consideration you paid for your interest in Creekside Enterprises, Inc. and list the total value of any voluntary contribution or loan you made to Creekside Enterprises, Inc.; and for each such item, state:

a. The date upon which any such payment, contribution, or loan was made.

b. The amount of all payments, contributions, or loans.

c. The source of all payments, contributions and loans.

d. The amount of stock or other consideration received from you by the corporation for such payments, contributions, or loans.

e. List the date upon which you received anything of value from Creekside Enterprises, Inc. and for each such, state:

(1) The amount you received.

(2) The reason you received such asset from the corporation.

(3) The name of the person who authorized such payment by the corporation to you.

7. List and describe any personal services or labor you performed on behalf of Creekside Enterprises, Inc. and for each such instance, state:

a. Date upon which such work or labor was done.

b. The total hours involved in the labor or activity.

c. List and describe any payments received by you for such work, labor or activity.

8. State the various positions you occupied with Creekside Enterprises, Inc. from the time of its existence to the present date including any corporate offices you held and the dates of the same.

9. List the names and current addresses and telephone numbers of each and every person who has ever held stock in Creekside Enterprises, Inc. from the date of its existence until the present date.

10. List the names of the current stockholders of Creekside Enterprises, Inc. and set out by each person the amount of stock which they own.

11. List the present creditors of Creekside Enterprises, Inc. along with their current addresses and telephone numbers.

12. List the names and current addresses and telephone numbers of each and every individual who has ever kept books for Creekside Enterprises, Inc. or who has, in any manner, assisted in the bookkeeping or record keeping of Creekside Enterprises, Inc.

13. List the names, current addresses and telephone numbers of each and every individual who has prepared or assisted in the preparation of any and all federal and state income taxes, quarterly reports or other such items of Creekside Enterprises, Inc.

14. List and describe the total income received by Creekside Enterprises, Inc. since its.[in]corporation through the present date.

15. List and describe the total expenses of Creekside Enterprises, Inc. from its incorporation until the present date.

16. List the names and current addresses and telephone numbers of each and every agent, or employee, of the Internal Revenue Service or any other agency of the federal government and of the North Carolina Department of Revenue or any other agent of the state government with whom you had any dealings or contact whatsoever with regard to Creekside Enterprises, Inc.

17. For each such individual listed above, describe the subject matter of your dealings.

. . . .

20. List the names, current addresses and telephone numbers of each and every person who signed all checks drawn on the account of Creekside Enterprises, Inc.

21. List the amount of consideration that each stockholder paid for Creekside Enterprises, Inc.

22. List the total assets held by the corporation known as Creekside Enterprises, Inc. before it started doing business and state the source of those assets.

23. State whether the corporation known as Creekside Enterprises, Inc. ever received any consideration for the stock originally issued to Brent Oakes.

24. State whether or not R. L. Martin, Jr. made a partial payment in the amount of $600.00 for this stock and state whether or not that check was covered by sufficient funds.

25. State in detail what happened to the materials taken out of the club known as "Players" owned by Creekside Enterprises, Inc. State whether or not these materials which were taken out of the club including stainless steel sinks and other expensive items were not, in fact, taken to the office of R. L. Martin, Jr. In addition, state where these items are at the present time.

26. State how Larry G. Sanderford got his share of any stock he owns at Creekside Enterprises, Inc. State whether or not Sanderford's stock was paid for and, if so, describe the source of the funds used to pay for the stock.

27. State whether or not any stock which may have been owned by Brent Oakes was ever acquired by Larry G. Sanderford. If so, state whether or not the corporation ever received any consideration for this stock and whether Larry G. Sanderford ever paid Brent Oakes for the stock.

28. Describe in detail the circumstances leading up to the acquisition by Larry G. Sanderford of any stock in Creekside Enterprises, Inc. originally issued to or owned by Brent Oakes.

29. List and describe in detail any lease agreements entered into by Creekside Enterprises, Inc. or by the business known as "Players." (A complete copy of any such leases will be sufficient to answer this interrogatory.)

30. Describe in detail what happened to the money from the $15,000 note that was to go into escrow for the lease agreement involving Creekside Enterprises, Inc.

31. List and describe each and every promissory note executed by Larry Sanderford or R. L. Martin, Jr. in any connection related to Creekside Enterprises, Inc. or to the business known as "Players."

32. State whether or not Henry Brown is a stockholder of Creekside Enterprises, Inc. If so, state the amount of stock owned by Henry Brown and list any consideration paid by Henry Brown or any other person for this stock.

33. List the names, current addresses and telephone numbers of each and every officer of Creekside Enterprises, Inc. from the date of its incorporation through the present date as well as any and all members of the Board of Directors of Creekside Enterprises, Inc. from the date of its incorporation to the present date.

34. Describe in detail the policy of the business known as "Players" with regard to membership dues including a description of what went with the money collected for membership dues.

35. State the number of members accepted by the business as "Players."

36. List the names, current addresses and telephone numbers of each and every person who has or who has ever had possession of any corporate minute book kept by Creekside Enterprises, Inc.

37. List the dates of any and all stockholders meetings called by Creekside Enterprises, Inc. and list the name, current address and telephone number of each and every person who was present at such stockholders meeting.

38. With regard to the meetings set out above, state whether or not minutes were kept of such meetings and state the name, address and telephone number of any and all persons who have possession of the minutes of any such meeting.

39. Describe in detail all circumstances relating to the firing of Lee Webb by the business known as the "Players." In this description, include in detail an account of any allegations made by Lee Webb to the effect that books kept by

Vickie Grissom were not in accordance with the actual records of the business and did not accurately account for the money taken in by the business known as the "Players."

40. Describe in detail all dealings and relationships between Vickie Grissom and Creekside Enterprises, Inc. and the business known as "Players." In this description, state in detail any capacity in which Vickie Grissom was employed by the corporation of the "Players" and describe what her function was during all times since the incorporation of Creekside Enterprises, Inc.

. . . .

42. Describe any and all functions or jobs that Bobby Richardson did on behalf of Creekside Enterprises, Inc. or "Players"; include in your description the dates during which Bobby Richardson was employed by Creekside Enterprises, Inc. or the business known as "Players." List the current address and telephone number of Bobby Richardson.

43. Describe any and all functions or jobs that Brent Oakes did on behalf of Creekside Enterprises, Inc. or "Players"; include in your description the dates during which Brent Oakes was employed by Creekside Enterprises, Inc. or the business known as "Players." List the current address and telephone number of Brent Oakes.

44. Describe any and all functions or jobs that Frankie Carroway did on behalf of Creekside Enterprises, Inc. or "Players"; include in your description the dates during which Frankie Carroway was employed by Creekside Enterprises, Inc. or the business known as "Players." List the current address and telephone number of Frankie Carroway.

45. Describe any and all functions or jobs that Lee Webb did on behalf of Creekside Enterprises, Inc. or "Players"; include in your description the dates during which Lee Webb was employed by Creekside Enterprises, Inc. or the business known as "Players." List the current address and telephone number of Lee Webb.

46. List the date upon which the business known as "Players" started doing business and list the date upon which that business was sold by Creekside Enterprises, Inc.

47. List and describe all assets owned by R. L. Martin, Jr., either solely owned or owned jointly with others.

48. List and describe all assets owned by Larry G. Sanderford, either solely owned or owned jointly with others.

49. List and describe all parcels of real estate owned by R. L. Martin, Jr., either solely or jointly with others, including entireties property; and for each such parcel, state:

a. All owners of that parcel and the portion of the whole which each owner holds.

b. Date of purchase.

c. Purchase price.

d. The current amount of any encumbrance upon the property.

e. Tax value as determined by the respective taxing authorities.

f. Current net annual income received from each parcel.

50. List and describe all parcels of real estate owned by Larry G. Sanderford, either solely or jointly with others, including entireties property; and for each such parcel, state:

a. All owners of that parcel and the portion of the whole which each owner holds.

b. Date of purchase.

c. Purchase price.

d. The current amount of any encumbrance upon the property.

e. Tax value as determined by the respective taxing authorities.

f. Current net annual income received from each parcel.

51. State R. L. Martin, Jr.'s current net worth.

52. State Larry G. Sanderford's current net worth.

53. List the name and address of any person, firm, partnership or corporation from which R. L. Martin, Jr. has obtained a loan of any amount or description within five years from the date of these interrogatories.

54. List the name and address of any person, firm, partnership or corporation from which Larry G. Sanderford has obtained a loan of any amount or description within five years from the date of these interrogatories.

55. List each and every person, firm, corporation or partnership to which a financial statement dealing with R. L. Martin, Jr. has been given, loaned, or supplied within five years from the date of these interrogatories. For each such listing above, state:

a. The date upon which such statement was given.

b. The name, current address and telephone number of each person to whom such statement was given.

c. The name, current address and telephone number of each person who currently has custody or possession of either the original or a copy of any such statements.

56. List each and every person, firm, corporation or partnership to which a financial statement dealing with Larry G. Sanderford has been given, loaned, or supplied within five years from the date of these interrogatories. For each such listing above, state:

a. The date upon which such statement was given.

b. The name, current address and telephone number of each person to whom such statement was given.

c. The name, current address and telephone number of each person who currently has custody or possession of either the original or a copy of any such statements.

57. State the adjusted gross income of R. L. Martin, Jr. for the years 1973 through 1978 as shown on his Federal Income tax returns.

58. State the adjusted gross income of Larry G. Sanderford for the years 1973 through 1978 as shown on his Federal income tax returns.

The requests for admission to which defendant was ordered to respond were as follows:

1. That the corporation known as Creekside Enterprises, Inc. owned the business known as "Players" for a period of time until it was sold on or about the 7th day of May, 1979.

2. That during the time that Creekside Enterprises, Inc. owned the business known as "Players" that business was profitable and the corporation known as Creekside Enterprises, Inc. realized a profit from the operation of that business.

3. That the United States Internal Revenue Service has determined that Creekside Enterprises, Inc. has earned a profit upon which it had not paid federal income taxes.

4. That R. L. Martin, Jr. and Larry G. Sanderford are officers and directors of the defendant Creekside Enterprises, Inc.

5. That Ada Pearl Stone and Cecil Glynn Jernigan, through their attorneys, have made demand upon R. L. Martin, Jr. and Larry G. Sanderford for inspection of [Creekside Enterprises,] Inc. and the record of shareholders or the voting list of Creekside Enterprises, Inc. and that in spite of such demands, the defendants, R. L. Martin, Jr. and Larry G. Sanderford, have refused and still refuse to allow the plaintiffs to make the inspections that have been requested.

6. That at all times mentioned in the complaint, R. L. Martin, Jr. and Larry G. Sanderford have exercised control over the corporation known as Creekside Enterprises, Inc.

7. That Creekside Enterprises, Inc. has assets over and above its liabilities and that the net worth of Creekside Enterprises, Inc. is greater than zero.

8. That on or about the 7th day of May, 1979, Creekside Enterprises, Inc. had assets over and above its liabilities and the net worth of the corporation was greater than zero.

9. That R. L. Martin, Jr. has never contributed as much as $12,000 to Creekside Enterprises, Inc. for any stock owned by R. L. Martin, Jr.

10. That Larry G. Sanderford has never contributed as much as $9,000 to Creekside Enterprises, Inc. for the purchase of stock in the name of Larry G. Sanderford.

11. That R. L. Martin, Jr. and Larry G. Sanderford have represented to the plaintiffs, Ada Pearl Stone and Cecil Glynn Jernigan, that the business known as "Players" had lost and was losing money and that the business known as "Players" and Creekside Enterprises, Inc. had no net assets.

. . . .

15. That the plaintiff, Ada Pearl Stone and the plaintiff, Cecil Glynn Jernigan, have requested, through their attorney, that R. L. Martin, Jr. and Larry G. Sanderford, as officers of Creekside Enterprises, Inc., bring an action against R. L. Martin, Jr. and Larry G. Sanderford for the recovery of money which they contend was converted by R. L. Martin, Jr. and Larry G. Sanderford.